IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM C. WILSON, | No. CIV S-08-2631-WBS-CMK-P |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| M.S. EVANS, Warden, | |
| Respondent. | |
| _____/ | |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1), respondent's answer (Doc. 16), and petitioner's reply (Doc. 36).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

A. **Facts**[1]

The California Supreme Court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Around 6:15 p.m. on April 6, 2000, the body of 13-year-old Sarah Phillips was found on the living room floor of her Vacaville home. She had been strangled with a telephone cord, and her body had suffered multiple bruises, scrapes, and scratches. Her pants and panties had been removed, and her shirt was pushed up.
>
> Defendant was arrested around 2:00 a.m. on the morning after the killing and charged with her murder. He had visited the victim's house regularly while dating her older sister three years earlier. DNA evidence as well as other evidence implicated him as the perpetrator. The Court of Appeal summarized the non-DNA evidence: "[Defendant] aggressively propositioned several women before the assault on Sarah, showing interest in whether they lived alone; he admitted speaking with Sarah around the time of the killing when she was alone at her home, where the killing occurred; he was seen by witnesses in the area before the killing, without scratches, and after the killing, with scratches consistent with the struggle indicated by the crime scene evidence; and shortly after the murder he told a witness he had done something bad, which he could not 'fix.'"
>
> The prosecution also presented DNA evidence. Three kinds of DNA tests (D1S80, DQA1 polymarker, and STR) were performed on bloodstains found on the victim's clothing and on defendant's clothing when he was arrested. All of the tests matched defendant's genetic profile to blood on the victim's jeans, and the victim's profile to blood on defendant's pants. The STR testing also matched the victim to a hair found in defendant's pants, and both the victim and defendant to blood found under the victim's fingernail.
>
> The STR test was the most sensitive. It compared nine genetic markers and included a marker for gender discrimination. Nicola, Shea, a criminalist with the Sacramento laboratory of the California Department of Justice (Department), was the prosecution's STR expert. She testified that, to help juries understand the significant of a DNA match, the Department followed the statistical approach recommended by a 1996 report of the National Resource Center for presenting the frequency with which genetic profiles occur. (Nat. Resource Center, The Evaluation of Forensic DNA Evidence (1996) (hereafter 1996 NRC Report)). The Department used databases that the Federal Bureau of Investigation published in the Journal of Forensic Sciences reflecting profile frequencies

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

in the Caucasian, Hispanic, and African-American populations, "because those are the major populations in our country and in our state."

Shea testified she used all three databases to avoid making assumptions about the ethnic background of the perpetrator. Data for other groups, such as Native Americans, would also be compared if information had indicated another group might be a source of the evidence sample – for example, if the crime had occurred on an Indian reservation. She explained that "the same profile will show up with a different frequency in the different populations." However, she also staid that "the three populations given give you a ballpark of how often you would expect to see that profile in those populations. If something is extremely rare in those three populations, you might expect it for that many markers to be extremely rare in one of the other populations." When nine genetic markers are used in the analysis, the result would be a "pretty discriminating number" no matter what population database was used.

Defendant's genetic profile would be expected to occur in one of 96 billion Caucasians, one of 180 billion Hispanics, and one of 340 billion African-Americans. The victim's genetic profile would be expected to occur in one of 110 trillion Hispanics, one of 140 trillion Caucasians, and one of 610 trillion African-Americans. Criminalist Shea noted that these profiles were extremely rare; the world contains only about six and a half to seven billion human beings.

Defendant objected to the introduction of these profile frequencies, arguing that the prosecution had failed to lay a foundation for this evidence because it did not establish the race of the persons who left the blood samples. The trial court disagreed and admitted the evidence. The jury found defendant guilty of first degree murder with use of a dangerous weapon during the commission of an attempted rape and a lewd act on a child.

B. **Procedural History**

Petitioner was convicted following a jury trial of first degree murder, committing a lewd act upon a child, and attempted forcible rape. The jury found true the special allegations that the murder was committed while petitioner was engaged in a lewd act upon a child and attempted rape. The jury also found that petitioner used a deadly and dangerous weapon during the commission of the crimes. On January 10, 2003, petitioner was sentenced to life in state prison without the possibility of parole, plus a consecutive term of eight years for committing a lewd act upon a child. Sentence for attempted forcible rape was stayed.

/ / /

/ / /

/ / /

1  Petitioner's conviction and sentence were affirmed by the California Court of
2 Appeal in a published opinion.  See People v. Wilson, 21 Cal. Rptr. 3d 102 (Cal. App. 1st Dist.
3 2004).  The California Supreme Court also affirmed in a published opinion.  See People v.
4 Wilson, 38 Cal.4th 1237 (2006).  Petitioner did not seek certiorari from the United States
5 Supreme Court and did not file any state post-conviction actions.  Respondent concedes that the
6 instant federal petition is timely and that petitioner's claims are exhausted.

## II.  STANDARDS OF REVIEW

9  Because this action was filed after April 26, 1996, the provisions of the
10 Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively
11 applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.
12 (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA
13 does not, however, apply in all circumstances.  When it is clear that a state court has not reached
14 the merits of a petitioner's claim, because it was not raised in state court or because the court
15 denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal
16 habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.
17 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach
18 petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208
19 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on
20 perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the
21 evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing
22 petition de novo where state court had issued a ruling on the merits of a related claim, but not the
23 claim alleged by petitioner).  When the state court does not reach the merits of a claim,
24 "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.
25 / / /
26 / / /

1   Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Thus, under § 2254(d), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412) .  "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc).  Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court.  See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct).  Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings.  See Carey, 549 U.S. at 74.

/ / /

/ / /

/ / /

5

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. <u>See id.</u> at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. <u>See id.</u> In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. <u>See id.</u> at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. <u>See Benn v. Lambert</u>, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. <u>See id.</u> If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. <u>See id.</u>

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. <u>See Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in <u>Williams</u>, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. <u>See Williams</u>, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. <u>See id.</u> at 410; <u>see also Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found

6

even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

### III.  DISCUSSION

Petitioner's claims all relate generally to the relevance of DNA evidence.  He states his claims as follows:

    A.  DNA expert's testimony arbitrarily selected the admission of irrelevant evidence of the rarity of the perpetrator's DNA profile in three facial groups was prejudicial to him . . .;

    B.  Respondent's argument of evidence code sections 801 and 802 rendered frequencies in three facial groups admissible is erroneous;

    C.  Respondent is incorrect in its assertion that a substantial body of case law supports the presentation of frequencies in a range of racial databases;

    D.  Respondent's inaccurate in claiming that appellant's contention has been rejected by California courts in the context of other types of forensic evidence;

    E.  Respondent is misguided in criticizing the alternative procedure of presenting the most conservative frequency without reference to race;

    F.  Respondent is wrong to trivialize the unfairness of the expert's arbitrary selection of three facial databases, and her omission of other racial databases; and

    G.  Respondent's argument that the error was harmless is mistaken.

/ / /

/ / /

/ / /

/ / /

In its published opinion, the California Supreme Court provided the following background discussion concerning the DNA evidence at issue in this case and petitioner's general claim of error:

> This murder case presents a narrow, but important, question regarding the admissibility of deoxyribonucleic acid (DNA) evidence to prove identity in criminal prosecutions. A DNA comparison of blood found at the crime scene with defendant's blood resulted in a match. That is, defendant's genetic profile matched that of the blood at the crime scene so that he could not be excluded as a donor of that blood. Similarly, a DNA comparison of blood found on defendant's pants when he was arrested with the victim's blood resulted in a match, so that the victim could not be excluded as a donor of that blood. Obviously, evidence tending to show that defendant's blood was found at the crime scene, and that the victim's blood was on the defendant's pants, would be highly probative to whether defendant was the killer.
>
> When a match is found, the next question is the statistical significance of the match. Of course, a match is less significant if the blood could have come from many persons rather than from only a few. Experts calculate the odds or percentages – usually stated as one in some number – that a random person from the relevant population would have a similar match. The question here revolves around exactly what is the relevant population. The question is complicated by the fact that the odds vary with different racial and ethnic groups. Because of this variation, separate databases are maintained for different population groups, and the odds for each group are calculated separately. In this case, as in many cases, no evidence exists of the racial or ethnic identity of the perpetrator other than evidence indicating that defendant was the perpetrator. Over defense objection, the trial court permitted the prosecution to present evidence of the odds as to the three most common population groups in this country – Caucasians, African-Americans, and Hispanics. For example, the evidence showed that only one Caucasian in 96 billion would match the crime scene blood that matched defendant's profile.
>
> Defendant contends the court erred. Relying heavily on the opinions in *People v. Pizarro* (1992) 10 Cal.App. 4th 57 (*Pizarro I*), and especially, *People v. Pizarro* (2003) 110 Cal.App. 4th 530 (*Pizarro II*), he argues that evidence regarding any particular population group is irrelevant absent independent evidence that the perpetrator was a member of that group. The Court of Appeal concluded that the trial court correctly admitted the evidence. We agree. As Justice Parrilli author of the majority opinion below, states, "When the perpetrator's race is unknown, the frequencies with which the matched profile occurs in various racial groups to which the perpetrator *might* belong are relevant for the purpose of ascertaining the rarity of the profile."

Respondent argues that there was no constitutional error and, even if there was, any error was harmless.

In analyzing the issue presented in this case, the California Supreme Court began by identifying what the trial court's should not do:

> In part, the *Pizarro* opinions condemned presenting evidence solely of the odds that a person of the *defendant's* population group was the donor. (citations omitted). On this point, the court was on solid ground. As one recent commentator has explained, "One strangely persistent fallacy in the interpretation of DNA evidence is that the relevant ethnic or racial population in which to estimate a DNA profile frequency necessarily is that of the defendant. The issue has been cogently analyzed, and it should be clear that the relevant population is the entire class of possible perpetrators." (citation omitted). Accordingly, we agree with the *Pizarro* opinions that a trial court should not admit evidence of the odds solely regarding the defendant's population group. Similarly, when the match involves the victim, the court should not admit evidence of the odds solely regarding the victim's population group.

The state court then observed that this case did not present this problem because the criminalist "testified that she followed standard practice of determining the frequency of the matched profiles using Caucasian, Hispanic, and African-American databases, in order to avoid making assumptions about the ethnic background of the perpetrator or the victim." The California Supreme Court concluded that the population group statistical evidence presented in this case was relevant, holding: "It is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples." The Court added:

> If a defendant wanted to argue that the perpetrator might have been a member of a population group for which the odds were more favorable to the defense, surely it would be relevant and permissible to admit evidence of those odds. Similarly, the prosecution should be permitted to present evidence of a representative range of groups.

The state court then turned to petitioner's more specific argument that "the evidence here was still improperly admitted because the expert gave the frequency range for only the three most common population groups, rather than *all* possible groups to which the perpetrator could belong." The Court concluded:

> Although giving results for all possible population groups would be permissible, doing so is not required to give relevance to the range of possibilities. Furthermore, it is not clear whether it is realistically feasible to include all population groups. . . . In this case, Criminalist Shea provided information regarding the three most numerous population

9

>    groups.  This made her testimony relevant and admissible.
>        Of course, defendant was entitled to cross-examine the witness regarding other possible population groups, as he did in this case.  When he did, the witness testified that the frequency of other population groups would be comparably small.  Moreover, if defendant believed the perpetrator could have been a member of another population group or groups for which the frequency figures would be more favorable to him, he was entitled to cross-examine the witness or present his own evidence in that regard.  The fact that defendants might proceed in either fashion does not make the evidence the prosecution presented irrelevant.

In affirming petitioner's conviction and sentence, the California Supreme Court disapproved the Court of Appeal's holding in Pizarro II "to the extent it concludes that evidence regarding any particular population group is inadmissible absent sufficient independent evidence that the perpetrator was a member of that group."

Petitioner claim is essentially that the trial court erred in its evidentiary ruling.  A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

1  971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see
2  also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).  To raise such a claim in a
3  federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of
4  justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95
5  (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).  In any event, an
6  evidentiary error is considered harmless if it did not have a substantial and injurious effect in
7  determining the jury's verdict.  See Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002); see
8  also Laboa v. Calderon, 224 F.3d 972, 976 (9th Cir. 2001).

In light of the logic of the California Supreme Court's analysis, this court simply cannot say that admission of the DNA evidence rendered petitioner's trial fundamentally unfair. First, the non-DNA evidence was certainly sufficient to convict, and petitioner does not argue otherwise.  Specifically: (1) petitioner had visited the victim's house regularly while dating her older sister three years earlier; (2) petitioner aggressively propositioned several women before the assault on Sarah, showing interest in whether they lived alone; (3) petitioner admitted speaking with Sarah around the time of the killing when she was alone at her home, where the killing occurred; (4) petitioner was seen by witnesses in the area before the killing, without scratches, and after the killing, with scratches consistent with the struggle indicated by the crime scene evidence; and (5) shortly after the murder he told a witness he had done something bad, which he could not "fix."  This evidence indicates that petitioner knew the victim, knew where she lived, had an interest in some kind of sexual encounter the day of the crime, was at the scene of the crime at the time of the crime, and had participated in some kind of struggle consistent with the struggle that occurred during the commission of the crime.  Even absent DNA evidence, this evidence was sufficient to convict.

Second, as the California Supreme Court observed, nothing in admission of the population group statistical evidence in this case prevented petitioner from cross-examining the witness on the absence of evidence from other population groups or presenting his own expert

11

evidence in this regard. In other words, petitioner was not in any way deprived of his right to present a defense or confront witnesses against him, which are two of the hallmarks of a fair trial.

Even if there is constitutional error, non-structural errors may be considered harmless. See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)). Constitutional errors fall into one of two categories – trial errors or structural errors. See Brecht v. Abrahamson, 507 U.S. 619, 629 (1993). Trial error "occur[s] during the presentation of the case to the jury" and "may . . . be quantitatively assessed in the context of other evidence presented in order to determine" its effect on the trial. Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991). Structural errors, on the other end of the spectrum, relate to trial mechanism and infect the entire trial process. See id. at 309-10. Denial of the right to counsel is an example of a structural error. See Brecht, 507 U.S. at 629-30 (citing Gideon v. Wainwright, 372 U.S. 335 (1963)). Improperly impeaching a defendant based on his silence after receiving Miranda warnings, however, is a trial error. See Brecht, 507 U.S. 629 (citing Doyle v. Ohio, 426 U.S. 610 (1976)). Structural errors to which the harmless error analysis does not apply are the "exception and not the rule" See Rose v. Clark, 478 U.S. 570, 578 (1986).

In Chapman, a case before the Supreme Court on direct review, the Court held that "before a [non-structural] constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. A different harmless error standard applies to cases on collateral review. In Brecht, the Court stated that applying the Chapman standard on collateral review "undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. at 637. The Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus – which is meant to afford relief only to those who have been grievously wronged – because it would require relief where there is only a reasonable possibility that a constitutional error contributed to the verdict. See id. Therefore, in habeas cases, the standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional

errors. See Brecht, 507 U.S. at 637. Under this standard, relief is available where non-structural error occurs only where such error "had a substantial and injurious effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776.

Here, any error with respect to admission of DNA evidence through the ciminalist's testimony was a trial error, and not structural, because it involved the presentation of evidence and not the mechanism of the trial. The court agrees with respondent that, even if error occurred, it was harmless because it did not have a substantial and injurious effect or influence on the verdict. As discussed above, there was ample non-DNA evidence upon which any rational jury could have concluded that petitioner was the perpetrator.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus (Doc. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 5, 2009

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE